**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

S-MART PETROLEUM INC.,
11909 Lakeside Drive
Fishers, ID 46038,
on behalf of itself and all others similarly
situated in the United States,

        Plaintiff,

vs.

PETROLEOS DE VENEZUELA, S.A.; PDV
AMERICA, INC.; CITGO PETROLEUM
CORPORATION; PDV HOLDING, INC.;
and, PDV MIDWEST REFINING, LLC;

        Defendants.

CIVIL ACTION NO.

Case: 1:07-cv-01179
Assigned To : Lamberth, Royce C.
Assign. Date : 6/29/2007
Description: Antitrust

*JURY ACTION*

## CLASS ACTION COMPLAINT

Plaintiff, S-Mart Petroleum, Inc. ("Plaintiff"), by and through its undersigned attorneys, brings this action on behalf of itself and all others similarly situated for treble damages and injunctive relief under the antitrust laws of the United States against the above-named Defendants. Plaintiff respectfully demands a trial by jury and complains and alleges as follows:

## INTRODUCTION

1. The Organization of Petroleum Exporting Countries ("OPEC"), an unincorporated association whose members include Venezuela and eleven other foreign countries, adopts and

1

enforces policies designed to facilitate a series of unlawful contracts and agreements in restraint of trade. The purpose and effect of these restraints on trade are the raising and stabilizing of the prices of crude oil and products refined from crude oil above competitive levels. OPEC's unlawful activities have an admitted, and decisive, impact on oil and refined petroleum products prices in the United States because OPEC members and cooperating states jointly control over 75% of the world's proven oil reserves and produce over 50% of the world's crude oil exports. The foreseeable and intended result of OPEC's price fixing and/or price stabilization agreements has been that the prices of both crude oil and refined products from crude oil have been inflated. Plaintiff and other class members have paid higher prices for refined products as a result of the cartel.

2.     The conspiracy formed by OPEC and its members is no longer limited to the nation state members of the OPEC cartel. The state-owned oil company of Venezuela, Petróleos de Venezuela, S.A. ("PdVSA"), and its affiliates in the United States, each through their own decisions and through conduct based inside as well as outside the United States, have knowingly joined the conspiracy to inflate the prices of crude oil and products refined from crude oil. Plaintiff therefore brings this action not against sovereign nations, but against five oil companies that participated in the OPEC conspiracy which has injured U.S. consumers.

3.     Enforcement of the antitrust laws against companies who join and facilitate the OPEC cartel is critical to protecting competition and U.S. consumers. The OPEC cartel will be strengthened, and its anticompetitive and illegal activities facilitated, if some of the largest oil companies in the world are allowed to directly participate in that cartel with impunity. If the antitrust laws are not enforced against oil companies acting in U.S. commerce, whether publicly

2

or privately owned, there will be no limits on knowing participation in or facilitation of the OPEC cartel or its market power, with respect to the pricing of crude oil and its refined products.

4.    This lawsuit is therefore brought as a class action on behalf of all persons who purchased refined petroleum products for delivery in the United States directly from any Defendant or co-conspirator during the Class Period. During the Class Period, Defendants and their co-conspirators, including the members of OPEC, participated in a conspiracy to fix, raise, maintain and stabilize the prices of refined petroleum products sold in the United States in violation of the antitrust laws. The conspiracy has affected billions of dollars in interstate commerce. Because of Defendants' anticompetitive conduct, Plaintiff and other class members paid artificially inflated prices for refined petroleum products and, as a result, have suffered antitrust injury to their business or property. Defendants' acts constitute a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1). In addition, this action is instituted to secure injunctive relief against Defendants to prevent them from violating Section 1 of the Sherman Act as described in this Complaint.

## JURISDICTION AND VENUE

5.    The claims in this Complaint are brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and members of the class by reason of the violations of Section 1 of the Sherman Act (15 U.S.C. § 1) as alleged herein.

6.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337, and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

7.      Venue is proper in this Judicial District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d).

8.      Defendants have agents, transact business, or are found within this Judicial District. Plaintiff's claims alleged in this Complaint arise in part within the United States and this District. Interstate trade and commerce as described herein has been carried out in part within this District. Defendants have transported and sold crude oil and refined petroleum products in the stream of interstate commerce that have reached this District.

## NATURE OF THE CASE

9.      The term "Refined Petroleum Products" (hereafter "RPPs") in this Complaint refers to the products processed and sold from refineries and storage facilities, including gasoline, heating oil, diesel fuel, aviation fuel, lubricants, asphalt, petrochemicals, and refined waxes.

10.     This action is brought as a class action on behalf of all persons who purchased RPPs for delivery in the United States directly from Defendants or their co-conspirators during the period four years before the filing of this Complaint plus any period of tolling of the limitations period (the "Class Period"). Plaintiff alleges that, during the Class Period, Defendants and their co-conspirators participated in a conspiracy to fix, raise, maintain and stabilize the prices of RPPs sold in the United States in violation of the antitrust laws. The conspiracy affected billions of dollars in interstate commerce. Because of the anticompetitive conduct of Defendants and their co-conspirators, Plaintiff and other members of the class paid artificially inflated prices for RPPs and, as a result, have suffered antitrust injury to their business or property. Defendants' acts constitute a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## PARTIES

### A.    Plaintiff

11.    Plaintiff S-Mart Petroleum, Inc. is an Indiana corporation with its principal place
of business located at 11909 Lakeside Drive, Fishers, Indiana.  During the Class Period, Plaintiff
purchased RPPs for resale directly from Defendants and was injured by reason of the antitrust
violations alleged in this Complaint.

### B.    Defendants

12.    Defendant Petróleos de Venezuela, S.A. is a Venezuelan commercial oil
corporation owned by the government of Venezuela and is the corporate parent of and exercises
complete control over its subsidiaries and agents, PDV America, Inc. ("PDV America"), PDV
Holding, Inc. ("PDV Holding"), Citgo Petroleum Corporation ("Citgo"), and PDV Midwest
Refining, L.L.C. ("PDV Midwest").  PdVSA and its subsidiaries produce and market crude oil
and RPPs.  During the Class Period, PdVSA transported its crude oil and RPPs to its subsidiaries
which refined crude oil and sold RPPs to Plaintiff and members of the class in the United States.
In 2005 alone, PdVSA exported 1.529 million barrels per day ("bpd") of petroleum products to
the United States.

13.    Although PdVSA is wholly owned by the government of Venezuela, PdVSA
operates, seeks and maintains commercial credit ratings, pays taxes, pays profits to ownership
and makes independent pricing and other relevant management decisions as a commercial
corporation.

14.    Defendant PDV America is a Delaware corporation, formed in 1986.  It is wholly
owned by PdVSA and oversees PdVSA's subsidiaries, which import crude oil and refine and sell

RPPs in the United States. PDV America, through its wholly-owned operating subsidiary Citgo and Citgo's subsidiary PDV Midwest, refines, markets and transports petroleum products, including gasoline, diesel fuel, jet fuel, petrochemicals, lubricants, asphalt and refined waxes, mainly within the United States. Until 2006, Citgo owned a 41 percent interest in Lyondell-Citgo Refining, L.P., a refinery located on the ship channel in Houston, Texas.

15.     Defendant Citgo is a Delaware corporation with its principal place of business in Houston, Texas. Citgo is a subsidiary of PDV America and operated refineries and sold RPPs directly to members of the Class during the Class Period. Citgo directly owns or operates 859,000 bpd of refining capacity in the United States.

16.     Defendant PDV Holding is a Delaware corporation, formed in 1997. It is a subsidiary of PdVSA and oversees the importation of Venezuelan crude oil and the refining and sale of RPPs to customers, including the Plaintiff class, in the United States. PDV Holding is wholly owned and controlled by PdVSA. PDV Holding directly owns additional subsidiaries with interests in refineries. For example, PDV Holding owns all of the stock of PDV Chalmette, Inc., which, in turn, owns a fifty percent interest in Chalmette Refining, LLC, which operates an 182,500 bpd capacity refinery in Louisiana. PDV Holding also owns all the stock of PDV Sweeny, Inc., which holds a 50 percent interest in a joint venture to operate the Merey Sweeny refinery in Sweeny, Texas.

17.     Defendant PDV Midwest is a Delaware corporation, formed in 1997, and is a subsidiary of PdVSA. PDV Midwest is engaged in the refining, marketing and transportation of RPPs to the plaintiff class in the Midwestern United States and in the East and Gulf Coasts.

## CO-CONSPIRATORS

18.    Other co-conspirators include members of OPEC and others which directly, or through their agents or instrumentalities, marketed crude oil and RPPs in U.S. and international commerce during the Class Period.

19.    Additional unnamed co-conspirators include representatives and agents of each of the Defendants and their affiliates and those oil companies who performed acts and made statements in furtherance of the conspiracy alleged herein.

20.    Other persons not named in this Complaint participated in the violations alleged herein and have performed acts and made statements in furtherance of the conspiracy as set forth hereafter, and are hereby designated as co-conspirators.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of a class (the "Class"):

22.    The Class is defined as:

> All persons (excluding governmental entities, Defendants, their subsidiaries and affiliates, and their co-conspirators) who purchased Refined Petroleum Products in the United States directly from any of the Defendants or their co-conspirators at any time during the period from the date four years prior to the filing of this Complaint (plus any period of tolling of the limitations period) to the present.

23.     Plaintiff does not know the exact size of the members of the Class, but there are at least several thousand members of the Class geographically dispersed throughout the United States. Joinder of all members of the Class in this action is impracticable.

23.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all members of the Class are direct purchasers of RPPs who paid artificially inflated prices for RPPs due to the unlawful conspiracy alleged herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class as the interests of Plaintiff are coincident with, and not antagonistic to, those of the members of the Class.

25.     Plaintiff's counsel are experienced and competent and have acted as lead counsel in other national class actions.

26.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

27.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members. Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

        A.     whether Defendants and their co-conspirators engaged in a contract, conspiracy or combination to fix, raise, maintain and stabilize the prices of RPPs sold in the United States;

        B.     whether the alleged contract, conspiracy or combination violated Section 1 of the Sherman Act;

        C.     the duration and extent of the contract, conspiracy or combination alleged herein;

D.    whether each of the Defendants was a participant in the contract, conspiracy or combination alleged herein;

E.    whether the Defendants' conduct caused the prices of RPPs to be set at higher levels than they would have been absent the conspiracy;

F.    the effect of Defendants' contract, conspiracy or combination upon United States interstate commerce;

G.    the appropriate measure of damages; and

H.    whether Plaintiff and members of the Class are entitled to declaratory or injunctive relief.

28.    Class action treatment is the superior and only method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

29.    Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

30.    OPEC is an unincorporated association formed in 1960 in Baghdad, Iraq. Its principal place of business, including its administrative and executive offices, are currently at Obere Donaustrasse 93, Vienna A-1020, Austria. OPEC's members are the Democratic People's

Republic of Algeria, the Republic of Indonesia, the Islamic Republic of Iran, the Republic of

Iraq, the Great Socialist People's Libyan Arab Jamahiriya, the State of Kuwait, the Federal

Republic of Nigeria, the State of Qatar, the Kingdom of Saudi Arabia, the United Arab Emirates,

the Bolivarian Republic of Venezuela, and the Republic of Angola.

31.    OPEC is not, according to its charter, controlled by nor does it control the

activities of any sovereign nation.  Rather, OPEC acts as an independent entity, owning real

estate in its own name, employing staff, setting and maintaining annual budgets, maintaining

bank accounts, employing auditors and accountants to prepare its financial statements, issuing its

own publications and acting independently of its members.  OPEC has its own website:

http://www.OPEC.org.

32.    The official OPEC website reads in part as follows:

> "OPEC's mission is to coordinate and unify the petroleum policies of
> Member Countries and ensure the stabilization of oil prices in order to
> secure an efficient, economic and regular supply of petroleum to
> consumers, a steady income to producers and a fair return on capital to
> those investing in the petroleum industry."

33.    Several meetings a year are conducted by OPEC to implement and coordinate the

production levels of its members.  This function, a key component in the operation of any cartel,

involves extensive discussion, negotiation and agreement among representatives of its members.

34.    OPEC's members together have a dominant share of world crude oil production

(particularly of "free supplies" available for export).  OPEC's members control more than 75

percent of the world's proven crude oil reserves and are responsible for more than 60 percent of

world oil production.

35.    In 1998, OPEC formulated its current price fixing strategy. In essence, OPEC set a price range of $22 to $28 per barrel as the target price for crude oil. According to OPEC, implementation of this price-stabilization band was intended at the upper $28 limit (among other things) to prevent fringe, high-cost producers from initiating production and thus adding to world oil supply with a resulting decrease in crude oil prices. Similarly, the lower $22 limit was intended to sustain a minimum level of monopoly profits acceptable to OPEC.

36.    The agreements to reduce crude oil supplies had their intended effect of reducing the supply of oil and RPPs to U.S. and other world markets.

37.    Defendants have added to the already unlawful profits earned by OPEC through extending the conspiracy beyond direct sales of crude oil to include sales of RPPs with the goal and result of reaping *further* and unjust profits in the form of excess prices paid for RPPs. These profits are passed on by Defendants to PdVSA in the form of dividends or other distributions.

38.    Commencing at a date some years prior to the Class Period and continuing until the present time, Defendants and co-conspirators have engaged in an unlawful continuing contract, combination and conspiracy in restraint of trade in violation of the Sherman Act to increase the price of RPPs sold in the United States to the members of the Class.

## DEFENDANTS' PARTICIPATION IN THE CARTEL

39.    In furtherance of the conspiracy, Defendants and co-conspirators have discussed, met, negotiated and made agreements on supra-competitive crude oil and RPP pricing levels. Among these agreements, PdVSA and its defendants and other subsidiaries joined OPEC, its members and other co-conspirators and adopted a common formula for crude oil pricing and

11

RPP pricing that was based on target profit margins on the sale of RPPs in the United States as well as in other global markets.

40.    Defendants and their co-conspirators have implemented their pricing agreements in various ways. These methods of implementing the conspiracy included but were not limited to: falsely announcing planned reductions in crude oil pumping in order to affect the futures market for crude oil and thereby RPPs; pumping crude oil but withholding it from the RPP market; restricting the operating capacities of their crude oil refineries and other means intended to create the perception of or actually create supply bottlenecks and crude oil shortages that would increase the prices of RPPs at the refinery level.

41.    In 1986, PdVSA entered the United States RPP market by forming PDV America and acquiring 50 percent of Citgo. PdVSA sought to acquire refineries in the United States, its most important market, so that it could ensure a stable outlet for its heavy crude oil and thus effectively participate in OPEC. To that end, PdVSA acquired 50 percent of Citgo's equity in 1986. At the time of the acquisition, PdVSA's president hailed the purchase as a major step in Venezuela's efforts to secure "steady, long-term markets for its crude oil." As part of the acquisition deal, Citgo agreed to purchase crude oil from PdVSA and its subsidiaries and affiliates for the next 20 years. In 1990, PDV America acquired the other 50 percent of Citgo's equity, thus giving PdVSA full control of the organization and operation of Citgo for the refining and marketing of RPPs. In 1997, PdVSA formed PDV Midwest Refining to engage in refining, marketing and transportation of RPPs in support of the conspiracy.

42.    Since these acquisitions, each of the Defendants has become a participant in the conspiracy described in this Complaint. As a co-conspirator, each Defendant has actively

12

participated in the illegal price-fixing conspiracy, has provided assistance to its co-conspirators, and has implemented price-fixing and supply restriction agreements.

43.     Each of the Defendants has knowingly participated in the conspiracy and provided additional material assistance to OPEC in numerous ways. PdVSA, for example, has directly participated in the conspiracy in various ways, including:

A.      On March 30, 1998, PdVSA agreed with representatives of other co-conspirators to cut production of crude oil and in an official communiqué OPEC stated that:

"member countries have agreed to voluntary cuts from each country's current production levels in an attempt to boost prices."

B.      In 2002, Ali Rodriguez Araque resigned as the Secretary General of OPEC to become head of PdVSA. He was replaced as Secretary General of OPEC by Venezuelan Oil Minister Alvaro Silva Calderon. On November 7, 2002, Alvaro Silva Calderon, then a representative and agent of PdVSA, stated:

"All countries have reaffirmed their commitment to the quotas. There are special circumstances that sometimes make it necessary [to overstep the limits], but we have the mechanisms of monitoring all members and we can control [the overproduction] . . .

*   *   *

The band has been useful in fulfilling the role for which it was created—aid [price] stability and is doing just that." (Oil Daily November 7, 2002).

C.      In May 2003, Alvaro Silva Calderon, a representative of PdVSA, stated that OPEC seeks to "devise ways and means of ensuring the stabilization of prices in international markets."

D.      In 2003, Alvaro Silva Calderon, a representative of PdVSA, stated in a United Nations publication article that:

"There was no basis in the supply-and-demand picture for such a hike, yet the uncertainty of what might happen drove prices higher. So to leave such a sensitive trading environment to its own devices would, in our opinion, be a sure recipe for disaster.

13

First and foremost, we must strive to keep market volatility to a minimum and ensure that prices stay at acceptable levels. We consider a price range of $22 to $28 a barrel as being reasonable, that is why we have adopted this as our target price band, carefully calculated as being fair for all market players.

However, due to the complexity of the industry and its exposure to so many prevailing influences, it is not a sector that can survive alone in a free market. It requires some form of management, as is the case in some other vital sectors such as agriculture."

E.    Rafael Ramirez Carreno, President and CEO of PdVSA organized and hosted an OPEC workshop on upstream oil contracts. He also attended OPEC conferences in 2003 and 2004.

F.    On its website dated May 5, 2005, PdVSA quoted Rafael Ramirez Carreno, both Venezuela's Energy and Petroleum Minister and President and CEO of PdVSA, as follows:

"Venezuela tops OPEC Quota: The country's current production is 3.3 mb/d versus the 3.4 mb/d originally programmed. PdVSA's President assures.

The minister pointed out emphatically that Venezuela was complying with the quota established by OPEC even going a little beyond it, as we and all the other countries in the organization have agreed and in the short term, we are going to solve our problem." (www.PdVSA.com)

G.    On May 22, 2005, Rafael Ramirez Carreno, President and CEO of PdVSA, stated:

"During the June OPEC meeting we must evaluate a production cut." (Free Internet Press.com)

H.    On May 24, 2006, Rafael Ramirez Carreno, the President and CEO of PdVSA, stated that he doubted if the OPEC cartel would ever allow prices to sink.

I.    In June 2006, at a speech at the 141st Extraordinary Ministerial Conference of OPEC, Rafael Ramirez Carreno, President and CEO of PdVSA and Venezuela's Oil Minister stated: "The success of our organization in the past six years arises from the cohesion of a common policy and strategy for our countries." (Recorded on PdVSA website.)

44.    Citgo has also joined the conspiracy and provided additional material assistance to OPEC in numerous ways specific to Citgo:

A.    Citgo has agreed with OPEC to provide the cartel, directly and through other defendants, with technical services and with information -- such as information on the United States market and demand for oil products -- that greatly assist OPEC in its effort to fix the price of oil and RPPs at anticompetitive levels.

B.    Members of Citgo's Board of Directors have participated directly in the development of OPEC's long-term strategy. Specifically, during the last four years, current Director Bernard Mommer and former Director Luis Vierma participated extensively in the development and drafting of OPEC's Long-Term Strategy while sitting on Citgo's Board of Directors. The purpose of the Long-Term Strategy document is to provide a "coherent and consistent vision" for OPEC's future until roughly the year 2020. The long-term strategy explicitly adopts as its objective the unlawful maintenance of oil prices by calling on OPEC members to take "proactive" measures to influence the "market" when prices become "too low." OPEC issued a press release explicitly praising Mr. Mommer for the "outstanding work" he performed in helping to "draw up a comprehensive long-term strategy for the Organization."

C.    Other Citgo executives participate in the organization and operation of OPEC. For example, Oswaldo Contreras, who was appointed Chairman of Citgo's Board of Directors in 2000, was instrumental in organizing OPEC's fortieth anniversary conference in Caracas, Venezuela, in that same year, and Fernando Garay, who served as Citgo's Corporate Secretary and is currently its Public Affairs Manager, served eight years at OPEC's Secretariat in Vienna.

D.    Citgo has employed and continues to employ former OPEC employees and consultants on a routine basis.

E.    Citgo provides PdVSA and Defendants with information, including data on the United States oil market, and technical services that greatly assist in the efforts of PdVSA and Venezuela to fix the price of oil at anticompetitive levels. For example, Citgo's former CEO Luis Marin acknowledged in 2003 that Citgo was "jointly analyzing" global oil markets to assist Venezuela in maximizing the price it receives for its oil. Mr. Marin explained, "We are working in a way we have never worked before, very integrated."

15

45.    Through these and other efforts, Citgo has fulfilled its pivotal role as a secure, reliable long-term purchaser of Venezuelan oil. Citgo is now the single largest purchaser of Venezuelan crude oil in the world. PdVSA, acting through affiliates, continues to have long-term contracts with Defendants and affiliates for the supply of oil. For example, Venezuela supplies more than 50 percent of Citgo's total refining capacity of more than 650,000 bpd.

46.    Defendants PDV America, PDV Holding and PDV Midwest have joined the conspiracy and have devoted refining capacity to refining Venezuelan oil as well as bought other refineries that have such capacity. Defendants have thereby materially assisted PdVSA and the conspiracy by removing the threat of buyers exercising downward pressure on the price of oil. These refineries acting in concert or alone could have extracted significant price concessions from Venezuela. OPEC member Venezuela was acutely threatened by the prospect of such concessions because few refineries are capable of refining its heavy crude oil in a cost-effective manner. Venezuela eliminated that threat by taking steps to acquire reliable refining facilities in the United States. As one of the OPEC nations with the largest reserves, Venezuela's participation in the OPEC cartel is essential to its success.

47.    Defendants have also facilitated the extension of the conspiracy from crude oil to RPPs. Defendants also participate as members of the conspiracy by implementing common formulas with other conspirators for RPP pricing and passing on profits from RPPs to PdVSA.

48.    Defendants have knowingly participated in OPEC's decisions, including, *inter alia*, the following decisions:

         A.    During the period 1993-1997, PdVSA agreed with representatives of other co-conspirators not to increase their crude oil production.

B.  On June 24, 1998, PdVSA agreed with representatives of other co-conspirators to cut production of crude oil by approximately 3.1 million bpd.

C.  On March 23, 1999, PdVSA agreed with representatives of other co-conspirators to cut oil output by a combined 2.104 million bpd effective April 1999 for one year.

D.  On March 28, June 21, September 10 and October 2000, PdVSA agreed with representatives of other co-conspirators to raise production of crude oil, but on November 12, 2000 agreed to delay any further production increases.

E.  In 2001, PdVSA agreed with representatives of other co-conspirators to cut or hold production quotas of crude oil on the following dates:

January 17 – Cut Production

March 17 – Cut Production

June 5 – Hold to Production Quotas

July 3 – Hold to Production Quotas

July 25 – Cut Production

November 14 – Cut Production

December 28 – Cut Production

F.  On January 1, 2002, PdVSA agreed with representatives of the commercial oil corporations of Oman, Russia, Mexico, Norway and Angola to cut production for six months.

G.  In 2002, PdVSA agreed with representatives of other co-conspirators to hold production of crude oil at the January 1, 2002 levels for the entire year of 2002.

H.  On April 24, 2003, PdVSA agreed with representatives of other co-conspirators to cut production of crude oil.

I.  On September 4, 2003, PdVSA agreed with other co-conspirators to cut production of crude oil.

J.  In 2004, PdVSA agreed with representatives of other co-conspirators to cut or hold production quotas of crude oil on the following dates:

17

February 11 – Cut Production

May 22 – Hold to Production Quotas

December 10 – Cut production.

K.   On September 20, 2005, December 9, 2005 and January 31, 2006, PdVSA agreed with representatives of other co-conspirators to hold to production quotas of crude oil.

L.   On June 1, 2006, PdVSA agreed with representatives of other co-conspirators to hold to production quotas.

M.   On September 11, 2006, PdVSA agreed with representatives of other co-conspirators to hold to production quotas.

N.   On October 19, 2006, PdVSA agreed with representatives of other co-conspirators to cut production.

50.   The conspiratorial agreements alleged herein and acts and statements in furtherance of the conspiracy involved private commercial acts by Defendants committed in locations outside of the territorial boundaries of the nations in which the parent organizations of Defendants and co-conspirators are located.  These locations include the sites hosting meetings and other events of various petroleum industry organizations, including OPEC meetings. Corporate agents and officers of Defendants and their co-conspirators regularly have met with each other during the course of OPEC and other industry meetings conducted in various locations around the world.

## INJURY TO TRADE AND COMMERCE AND THE CLASS

51.   PdVSA directly and through its subsidiaries and affiliates named as additional Defendants herein, as well as their co-conspirators, operates in the crude oil market by selling crude oil to third party entities for refining RPPs and also in the RPP market directly by refining crude oil into RPPs and selling RPPs in the United States.  Defendants' conduct is purposely

directed at raising prices paid for RPPs in the United States by direct purchasers, including Plaintiff.

52.    The price of crude oil is the largest cost affecting the price of RPPs. Together, Defendants and their co-conspirators have market power over both crude oil and RPPs sold in the United States.

53.    Defendants and their co-conspirators have an economic motive to agree and conspire to sell RPPs at supra-competitive prices. A failure to agree on crude oil and RPP pricing between them would mean that they would face price competition and price declines in some RPP markets. When Defendants and their co-conspirators agreed on crude oil and RPP pricing target levels, RPP prices increased in the United States.

54.    The unlawful conduct of Defendants and co-conspirators, described heretofore, caused the prices of RPPs sold in the United States to increase during the Class Period to levels higher than they would have been absent their unlawful conduct.

55.    As a result of the unlawful conduct of Defendants and co-conspirators, the price of crude oil in the United States increased from approximately $10 per barrel in 1998 to a high of $78 per barrel in 2006, and the prices of RPPs increased to the highest levels in history.

56.    The agreements by Defendants and co-conspirators described herein constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26.

57.    During the Class Period, Defendants and co-conspirators operated in several states and sold and shipped, or caused to be shipped, substantial quantities of crude oil and RPPs

19

in a continuous and uninterrupted flow in interstate commerce to refineries and customers located in several states.

58.    The unlawful conduct of Defendants and their co-conspirators has had a substantial and adverse impact on interstate trade and commerce in the United States and caused injury to Plaintiff and members of the Class during the Class Period. The unlawful conduct of Defendants and co-conspirators has directly, substantially and foreseeably restrained such trade and commerce.

59.    Plaintiff and members of the Class purchased RPPs at prices higher than they would have paid but for the unlawful conduct of Defendants and their co-conspirators as set forth herein, and, as a direct result, Plaintiff and members of the Class have sustained injury to their business and property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Class pray:

1.    That the Court determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2.    That the unlawful conspiracy alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation Section 1 of the Sherman Act, 15 U.S.C.§ 1;

3.    That Plaintiff and members of the Class recover treble damages, as provided by law, determined to have been sustained by each of them and that joint and several judgments in favor of Plaintiff and members of the Class be entered against Defendants;

4.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing the unlawful contract, combination and conspiracy alleged herein;

5.    That Defendants be enjoined from continuing their unlawful activity and ordered to cease and desist from participating in any unlawful conduct or agreements which have as their purpose increasing the prices of RPPs;

6.    That Defendants be permanently enjoined from any unlawful actions intended to raise the prices of RPPs sold in the United States upon a finding that Defendants participated in the conspiracy;

7.    That the United States subsidiaries of Defendant PdVSA which engage in the petroleum industry be sold and transferred and divested from the ownership and control of PdVSA upon a finding that Defendants participated in the conspiracy and that a timetable for sale and divestiture of these subsidiaries be ordered by this Court;

8.    That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

9.    That Plaintiff and members of the Class be granted such other, further and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues triable of right by a jury.

Dated: June 27, 2007

Timothy Battin              Bar Number: 436303
Joshua Raynes               Bar Number: 497839
Straus & Boies, LLP
4041 University Avenue
Fairfax, VA 22030
Tel: 703-764-8700
Fax: 703-764-8704
E-mail: tbattin@straus-boies.com
          jraynes@straus-boies.com

Of Counsel:
Mark J. Schirmer
Straus & Boies, LLP
1661 International Place Drive, Suite 400
Memphis, TN 38120
Tel: (901) 818-3146
Fax: (901) 818-3147
Email: mschirmer@straus-boies.com


David Anderson,
Anderson & Associates, P.C.
11550 N. Meridian Street, Suite 125
Carmel, IN 46032
Tel: 317 663-3667
Fax: 866 875-7384
E-mail: andersonlawassoc@sbcglobal.net

**ATTORNEYS FOR PLAINTIFF**
**S-MART PETROLEUM, INC.**

JS-44
(Rev.1/05 DC)

CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| S-Mart Petroleum Inc. | PETROLEOS DE VENEZUELA, S.A.; PDV AMERICA, INC.; CITGO PETROLEUM CORPORATION; PDV HOLDING, INC.; and, PDV MIDWEST REFINING, LLC. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ____88888____ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ (IN U.S. PLAINTIFF CASES ONLY) _____ NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Timothy Battin Joshua Raynes Straus & Boies, LLP 4041 University Avenue Fairfax, VA 22030 Tel: 703-764-8700 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

⊙ 3 Federal Question
(U.S. Government Not a Party)

O 2 U.S. Government Defendant

O 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ⊙ A. Antitrust | O B. Personal Injury/ Malpractice | O C. Administrative Agency Review | O D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| [X] 410 Antitrust | [ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Medical Malpractice<br>[ ] 365 Product Liability<br>[ ] 368 Asbestos Product Liability | [ ] 151 Medicare Act<br><br>Social Security:<br>[ ] 861 HIA ((1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g)<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g)<br>Other Statutes<br>[ ] 891 Agricultural Acts<br>[ ] 892 Economic Stabilization Act<br>[ ] 893 Environmental Matters<br>[ ] 894 Energy Allocation Act<br>[ ] 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| O E. General Civil (Other) | OR | O F. Pro Se General Civil |
|---|---|---|

**Real Property**
[ ] 210 Land Condemnation
[ ] 220 Foreclosure
[ ] 230 Rent, Lease & Ejectment
[ ] 240 Torts to Land
[ ] 245 Tort Product Liability
[ ] 290 All Other Real Property

**Personal Property**
[ ] 370 Other Fraud
[ ] 371 Truth in Lending
[ ] 380 Other Personal Property Damage
[ ] 385 Property Damage Product Liability

**Bankruptcy**
[ ] 422 Appeal 28 USC 158
[ ] 423 Withdrawal 28 USC 157

**Prisoner Petitions**
[ ] 535 Death Penalty
[ ] 540 Mandamus & Other
[ ] 550 Civil Rights
[ ] 555 Prison Condition

**Property Rights**
[ ] 820 Copyrights
[ ] 830 Patent
[ ] 840 Trademark

**Federal Tax Suits**
[ ] 870 Taxes (US plaintiff or defendant
[ ] 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
[ ] 610 Agriculture
[ ] 620 Other Food &Drug
[ ] 625 Drug Related Seizure of Property 21 USC 881
[ ] 630 Liquor Laws
[ ] 640 RR & Truck
[ ] 650 Airline Regs
[ ] 660 Occupational Safety/Health
[ ] 690 Other

**Other Statutes**
[ ] 400 State Reapportionment
[ ] 430 Banks & Banking
[ ] 450 Commerce/ICC Rates/etc.
[ ] 460 Deportation

[ ] 470 Racketeer Influenced & Corrupt Organizations
[ ] 480 Consumer Credit
[ ] 490 Cable/Satellite TV
[ ] 810 Selective Service
[ ] 850 Securities/Commodities/ Exchange
[ ] 875 Customer Challenge 12 USC 3410
[ ] 900 Appeal of fee determination under equal access to Justice
[ ] 950 Constitutionality of State Statutes
[ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 for illegal restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS  ☒ ACTION UNDER F.R.C.P. 23   DEMAND $ treble damages as determined at trial  Check YES only if demanded in complain  JURY DEMAND:  YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE 6/28/07   SIGNATURE OF ATTORNEY OF RECORD _____

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.